(159 App. Div. 192.)
### TWEEDIE TRADING CO. v. CRAIG et al.

(Supreme Court, Appellate Division, First Department.   November 14, 1913.)

1. SHIPPING (§ 175*)—CARRIAGE OF GOODS—DELIVERY TO SHIP.
     The charter party being silent as to the wharf at which the cargo of lumber was to be loaded, and it not appearing that when it was made the carrier knew on what wharf it was, or how it was piled, but it being provided merely that the shipper should furnish the lumber at the rate of 200,000 feet per day, and that the ship should employ her own stevedore, it was the shipper's duty to deliver the lumber at a place convenient for loading directly into the ship.
     [Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 572–574;  Dec. Dig. § 175.*]

2. SHIPPING (§ 172*)—DEMURRAGE—DELIVERY TO SHIP—EVIDENCE—CUSTOM AND USAGE.
     On the question of what would be a good delivery within a shipper's duty of delivering lumber at a place convenient for loading directly into the ship, the charter party being silent thereon, it may be shown, under appropriate pleading, in an action by the carrier for demurrage, that there was a general usage or custom requiring the shipper to bring the lumber within reach of the ordinary ship's tackle.
     [Ed. Note.—For other cases, see Shipping, Cent. Dig. § 569;  Dec. Dig. § 172.*]

3. SHIPPING (§ 184*)—DEMURRAGE—ACTION—EVIDENCE.
     The burden being on plaintiff, in an action by a carrier for demurrage, to show the delay was caused by the shipper's failure to deliver the lumber within reach of the ordinary ship's tackle, it was entitled to show, not only that it had such tackle, but also the difference between what the·stevedores could have loaded, had the lumber been delivered within such distance, and what they were able to load with the lumber delivered as it was.
     [Ed. Note.—For other cases, see Shipping, Cent. Dig. § 596;  Dec. Dig. § 184.*]

4. EVIDENCE (§ 520*)—OPINIONS—SUBJECT OF EXPERT TESTIMONY.
     The question how much lumber a given number of stevedores could load into a steamer in a given time is one on which expert testimony is proper.
     [Ed. Note.—For other cases, see Evidence, Cent. Dig. § 2329;  Dec. Dig. § 520.*]

5. SHIPPING (§ 184*)—DEMURRAGE—ACTION—DAMAGES—EVIDENCE.
     A carrier, in an action for demurrage because of the shipper's failure to deliver the lumber sufficiently near the ship, shows damages, it showing it did not own the ship, but had it on time charter and was paying therefor a certain amount per day, and also showing the amount and value of the coal used per day while the vessel was delayed at the dock.
     [Ed. Note.—For other cases, see Shipping, Cent. Dig. § 596;  Dec. Dig. § 184.*]

6. SHIPPING (§ 175*)—DEMURRAGE—EFFECT OF BILL OF LADING.
     In the absence of evidence of intention to the contrary, the bill of lading, though issued after the vessel was loaded, providing "any detention

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

on the part of the shipper in supplying cargo as fast as steamer can receive to be accounted for by payment of demurrage" at a certain rate, relates back, and governs liability of the shipper for delay caused by him during the loading.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 572–574; Dec. Dig. § 175.*]

Hotchkiss, J., dissenting in part.

Appeal from Trial Term, New York County.

Action by the Tweedie Trading Company against George F. Craig and others, partners as George F. Craig & Co. From a judgment dismissing the complaint, pursuant to an order made on motion at the close of plaintiff's case on a trial of the issues before the court and a jury, plaintiff appeals. Reversed and new trial granted.

See, also, 157 App. Div. 911, 142 N. Y. Supp. 1148.

Argued before INGRAHAM, P. J., and LAUGHLIN, SCOTT, DOWLING, and HOTCHKISS, JJ.

Ralph James M. Bullowa, of New York City (Emilie M. Bullowa, of New York City, on the brief), for appellant.

D. Theodore Kelly, of New York City (Charles F. Williams, of New York City, on the brief), for respondents.

LAUGHLIN, J. The action is brought to recover demurrage and additional special damages through the alleged failure of the defendants to furnish a cargo of lumber for loading on plaintiff's steamship Nordpol in accordance with the provisions of a charter party made between the parties, the Southern Shipping Company acting as broker for the plaintiff, and one of the defendants for the defendants, on the 7th day of January, 1907, at Savannah, Ga. The charter party is in the form of a letter addressed by said shipping company to one of the defendants, and accepted by him in writing, the body of which is as follows:

"We hereby confirm for account of the Tweedie Trading Company, New York, engagement from you of a million and a quarter feet (1,250,000 ft.) pitch pine lumber hence to St. John, N. B., by the above steamer, on the following terms:

"Rate to be seven dollars ($7.00) per thousand superficial feet, under deck, charge [sic] to be furnished here at the rate of two hundred thousand feet (200,000 ft.) per working day and to be discharged on cars at port of discharge, according to the custom of the port. Ship to employ her own stevedore and to have the privilege of taking other cargo and calling at other ports en route. Steamer is now on passage to Savannah from Hampton Roads, and will be ready for cargo immediately she arrives, which should be tomorrow afternoon or Wednesday morning."

At the time the contract was made most of the cargo, but, according to some of the evidence, not all of it, was on a schooner dock or wharf in Savannah; but whether or not that fact was known to plaintiff's agent does not appear.

The evidence shows that the steamer arrived in Savannah at 7:30 o'clock in the morning of January 8th. The captain reported to Mr. Harris who was the president and manager of said shipping company, and he testified that "Mr. Harris told me where to berth." The evidence shows that the steamer was moored at the dock where the lum-

ber was piled shortly after noon on the 9th of January, and it is stated in the points on both sides that the loading began on that day, and was completed on the 21st or 22d of the same month; but those facts appear in the record from a translation of a Norwegian log book which was excluded and marked for identification. It appears that there was a railroad track along the dock, and the lumber, which evidently was brought to the dock on cars, was placed in piles lengthwise of the dock and parallel with the string piece of the dock, leaving an open space of about 10 or 12 feet between it and the lumber. Outside this string piece pier points extended into the water between 30 and 40 feet, at the extreme points forming projections described as appearing like the teeth of a saw. They were designed for berths for small schooners. The Nordpol was 340 feet in length, and when brought to the dock extended both at the stern and bow considerably beyond three of these pier points, so that the side of the vessel nearest the dock was some 30 or 40 feet from the string piece, consequently between 40 and 52 feet from the nearest lumber. The vessel contained four holds for lumber and was equipped with tackle and a hoisting engine and apparatus for loading the lumber, and employed the ordinary number of stevedores to load the lumber into the four holds at the same time. The lumber piles extended back about 30 or 40 feet, so that some of it was about 90 feet from the side of the vessel. The evidence does not show where the lumber which was brought to the dock after the steamer arrived, if any was so brought, was placed. The evidence shows that the ordinary ship's tackle was inadequate to reach this lumber on account of the distance at which it was piled from the side of the steamer, and that it was necessary to drag the lumber partly over the pier and pier points and partly over the water between the pier points to the side of the steamer, and then to lift it over the side and into the hatches; and the captain testified that "to load the lumber we had to use the whole tackle, and an extra tackle added to that, to reach up to the piles," and that the necessity of dragging materially detained the loading of the steamer.

The plaintiff alleged that after the cargo was loaded it issued a bill of lading, which was delivered to and accepted by the defendants, and constituted the agreement between the parties for the transportation of the lumber, and that it was provided therein that the steamer should commence loading immediately on arrival at the port, and continue loading, working all hatches at once, day and night and Sundays and holidays, "any custom of the port to the contrary notwithstanding," and that:

"Any detention on the part of the shipper in supplying cargo as fast as steamer can receive to be accounted for by the payment of demurrage by them at the rate of eight pence British sterling per steamer's net register ton, and steamer to have a lien on cargo for same."

In the complaint, as originally served, it was alleged that the defendant failed to deliver the lumber according to the contract and bill of lading, and thereby became liable to plaintiff for demurrage as prescribed in the bill of lading. On the trial the complaint was amended by adding an allegation to the effect that, under the provisions of the

contract and bill of lading, and under the custom of the business and of the port and of all Atlantic ports:

"When a shipper is required to furnish lumber to a steamer, to be loaded at a certain rate, the custom requires that the shipper, if it supplies the wharf, supply a wharf where the ship can load the lumber within reach of the ship's tackles."

[1] On objection interposed on behalf of the defendant the court excluded evidence by which, evidently, plaintiff expected to show that in negotiating the contract nothing was said with respect to the wharf from which the lumber was to be loaded or, at least, that plaintiff's agent at Savannah did not inform it where the lumber was. It is argued in behalf of the respondent that it is to be inferred that plaintiff's agent knew where the lumber was, and that the charter party is to be considered as having been made for the loading of the lumber at that particular dock, and from the place where the lumber was then piled thereon. The evidence does not establish the premises upon which that legal argument is founded. It may be argued, with at least equal if not greater force, that if the carrier had intended to accept the lumber as it was piled on the dock as a good delivery for loading, the contract would have so provided, instead of providing in general terms that the shipper should *furnish* the lumber at the rate of 200,000 feet per day. It is no answer to this suggestion that the lumber may not have all been on the dock at that time, for if the contract was made with reference to that particular dock and the location of the lumber at the time, it is reasonable to infer that it would have contained a reference to the dock, and would have contained some express provision with reference to the lumber which was not then there. For the purposes of this appeal, therefore, the contract is to be interpreted as one silent with respect to the wharf at which the cargo was to be loaded. In such circumstances, manifestly, it is the duty of the shipper to deliver the cargo at a convenient place for loading in the port from which the shipment is to be made. It is no more the duty of the carrier, in the absence of some general custom which might be controlling, to unload the lumber from cars, or to haul it from any considerable distance to the ship's side, than it would be to cut the timber in the forest and saw and transport the lumber. The contract provided that the ship should employ her own stevedore, and it is fairly to be inferred that the lumber should be so placed that the only labor required to load it into the holds of the vessel would be that ordinarily performed by stevedores, which is confined to loading and unloading vessels in port under the direction and subject to the control of the master of the ship. The Elton, 83 Fed. 519, 31 C. C. A. 496; Rankin v. Merchants' & Miners' Trans. Co., 73 Ga. 229, 54 Am. Rep. 874. It is fairly to be implied that the cargo was to be delivered at a place convenient for loading directly onto the steamer. On the evidence to which reference has been made, I think the plaintiff showed a breach of the contract on the part of the defendant in not delivering the lumber at a convenient point for loading.

[2] On the precise question, however, as to what would be a good delivery in such circumstances, I think it was competent to show, under

the amended complaint, that there was a general, but well-known, usage or custom under which it was the duty of the shipper to bring the lumber within reach of the ordinary ship's tackle. The plaintiff was precluded from presenting such evidence, and since the charter party was silent on that point, I am of opinion that the court erred in excluding the evidence. McPherson v. Cox, 86 N. Y. 472; Donovan v. Standard Oil Co., 155 N. Y. 112, 49 N. E. 678. Notwithstanding the exclusion of this evidence, the court did admit evidence tending to show that by custom a delivery more than 50 feet from the side of the vessel would not be a good delivery. It being uncontroverted that a large part of the lumber was delivered at a distance considerably greater than 50 feet, that evidence showed a breach of duty on the part of the defendants.

[3] While the plaintiff was permitted to offer some general evidence from which it may be inferred that the ship was equipped with the usual tackle, and that the necessary number of stevedores was employed, yet the court erred in excluding definite proof to show that the steamer was properly equipped with tackle in ordinary use, and how much lumber could have been loaded with the force employed, if the lumber had been delivered within reach of the ship's tackle, for the burden was on the plaintiff to show that the delay was necessarily caused by defendants' failure to deliver the lumber within reach of the ship's tackle, and in order to do that it was necessary to show how much the stevedores could have loaded had the delivery been made according to the contract, as well as how much they were able to load in taking the lumber from beyond the reach of the ship's tackle.

[4] The question as to how much lumber a given number of competent stevedores could load into the steamer in a given time manifestly was one upon which it was proper to give expert evidence, and it is doubtful whether it could be proved in any other manner, for neither the court nor the jury could take judicial notice of such matters (Van Wycklen v. Brooklyn, 118 N. Y. 424, 24 N. E. 179), and it is not quite clear that the facts could be so stated or described to the jury as to enable them to reach a correct determination with respect thereto (McRorie v. Monroe, 203 N. Y. 426, 96 N. E. 724, Ann. Cas. 1913B, 94; Jenks v. Thompson, 179 N. Y. 20, 71 N. E. 266; see, also, Finn v. Cassidy, 165 N. Y. 584, 59 N. E. 311, 53 L. R. A. 877; German Ins. Co. v. N. Y. Gas & El. Co., 103 App. Div. 310, 93 N. Y. Supp. 1132, affirmed 185 N. Y. 581, 78 N. E. 1103; Regan v. Brooklyn Heights R. R. Co., 115 App. Div. 705, 101 N. Y. Supp. 213).

[5] Counsel for the respondent contends that the plaintiff failed to show any damages, and that therefore the judgment should in no event be reversed. The principal argument on this point is to the effect that the bill of lading, which was issued after the cargo was loaded, does not govern demurrage for detention at the port of lading. The plaintiff, however, gave evidence of substantial damages which it would be entitled to recover even though the bill of lading does not govern demurrage for detention while loading. The plaintiff showed that it did not own but had the Nordpol "on time charter," by

which was meant that it had the entire use of the vessel, and, further, that it was paying at the rate of $149.49 per day therefor. Plaintiff also showed the amount and value of the coal used per day while the vessel was delayed at the dock.

[6] These views require a reversal; and, although the question as to whether the bill of lading is controlling on the question of demurrage is not presented for decision, since that question has been argued on both sides and will arise on a new trial, we deem it proper to discuss it to some extent. The freight charges were to be and were paid on the delivery of the cargo at the port of destination. The record does not show the circumstances attending the delivery, and since the effect thereof therefore could not be fully argued, we express no opinion as to whether the plaintiff may or may not have waived its right to recover by relinquishing its lien and surrendering the cargo, or by anything else occurring at that time.

It is claimed on the part of the respondents that the plaintiff issued the bill of lading without making any claim for demurrage or other charges, and that it thereby waived its right thereto. On that point also the record does not fully disclose the facts. The plaintiff merely showed by the testimony of one of the defendants that while the cargo was being loaded he suggested to plaintiff's agent that defendants' form of bill of lading be used, and was advised that plaintiff requested that its own form of bill of lading be used, and that, after asking to have certain clauses put in plaintiff's bill of lading—from clauses added in writing, it would seem that such request was granted—he agreed to accept plaintiff's form of bill of lading, and it was prepared and issued accordingly. In view of the provisions of that bill of lading with respect to demurrage at the port of loading, it cannot be said that the issuance thereof in and of itself constitutes a waiver of plaintiff's right to demurrage or damages. The charter party contained no provision with respect to demurrage. It was evidently contemplated by both parties that as soon as the cargo should be loaded a bill of lading containing the *usual* provisions with respect to such cargoes would be issued, and the negotiations of the parties with respect to the form of the bill of lading to be issued clearly show that such was their intention. The first line of the bill of lading is printed in red in the form of a notice that the bill of lading "constitutes the contract between the shipper, * * * and the steamer." It is well settled that by accepting the bill of lading before the shipment of the cargo the defendant became bound thereby, notwithstanding the fact that the preliminary contract rested in parol, or was evidenced by a writing and merely prescribed the freight charges. German Ins. Co. v. M. & C. Co., 72 N. Y. 90, 28 Am. Rep. 113; Hill v. Syracuse, Binghamton R. R. Co., 73 N. Y. 351, 29 Am. Rep. 163. The case at bar is much stronger, for here the parties negotiated the form of the bill of lading, and agreed upon the same while the cargo was being loaded. It is therefore quite clear that the rights and liabilities of the plaintiff and defendants *after* the issuance of the bill of lading were governed thereby.

It is contended, however, that since the delay, of which complaint

is made, occurred *prior* to that time, the bill of lading is not controlling. In the absence of evidence that the parties did not intend that the bill of lading should not control the question of the rate of demurrage, we are of opinion that the bill of lading relates back and governs the liability of the defendant for demurrage. It was not expressly shown, but it is fairly to be inferred, that it was usual to incorporate in bills of lading which are issued after the cargo is loaded provisions governing demurrage at the port of loading as well as at the port of destination. If, therefore, this was a customary and usual provision it must have been contemplated by the letter herein quoted. See Donovan v. Standard Oil Co., supra.

It follows that the judgment should be reversed, and a new trial granted, with costs to appellant to abide the event.

INGRAHAM, P. J., and SCOTT and DOWLING, JJ., concur.

HOTCHKISS, J. I concur except so far as the effect of the bill of lading on the question of demurrage is concerned. Whether the bill of lading was or was not intended to express on this subject any contract between the parties cannot, I think, be determined on this record. Nor do the circumstances permit of so much as a finding that the bill of lading was prima facie intended as evidence of any such contract. I do not think the cases of German Ins. Co. v. M. & C. Co., and Hill v. S. & B. R. R. Co., apply where there has been a charter party and a bill of lading is issued to the shipper after the event has happened which gives rise to the litigation.